IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DOUGLAS S. MILLS,

        Plaintiff,

        v.

PEACEHEALTH, dba
PEACEHEALTH LABORATORIES,

        Defendant.

_____

Civ. No. 6:12-cv-02320-MC

OPINION AND ORDER

MCSHANE, Judge:

        This Court is asked to consider: (1) whether defendant discriminated against plaintiff because of his religion (Judaism) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (Title VII) and (2) whether defendant subjected plaintiff to a hostile work environment under Title VII.[1] Because (1) plaintiff's allegations of disparate treatment do not meet his burden under *McDonnell Douglas* and (2) plaintiff's allegations of discriminatory conduct are not sufficiently severe or pervasive to alter the conditions of his employment, this Court finds that defendant did not violate Title VII. Thus, defendant's motion for summary judgment, ECF No. 27, is GRANTED.

## PROCEDURAL AND FACTUAL BACKGROUND

        This action arises out of alleged disparate treatment and hostile work environment.

Plaintiff is an individual who practices Judaism. Pl.'s Second Am. Compl. 2, ECF No. 8.

---

[1] Plaintiff stipulated that defendant should be awarded summary judgment as to his third (Retaliation) and fourth (Intentional Infliction of Emotional Distress) claims for relief. *See, e.g.*, Pl.'s Resp. to Def.'s Mot. Summ. J. 2, ECF No. 36.

Pursuant to his religious practices, plaintiff wears a kippah also known as a yarmulke,[2] and tzitzit.[3] *See, e.g.*, Decl. of Aaron W. Baker 23, ECF No. 37-2.

Plaintiff began working for defendant, a nonprofit catholic health care provider,[4] as a medical laboratory technician in March 2005. Decl. of Joy Ellis 2, ECF No. 29-1. In September 2009, plaintiff accepted a new evening shift position; medical technologist. *Id.* at 5. Plaintiff's new full-time (32-hour per week) position included a pay raise and required plaintiff to "be very flexible in [his] availability." Decl. of Aaron W. Baker 1, ECF No. 37-3.

Sometime in 2009, a coworker, Chris Pettit, allegedly told plaintiff that he should not wear a kippah, and repeatedly commented that plaintiff's tzitzit were actually pasties that he used to sexually stimulate himself. Decl. of Joy Ellis 3, ECF No. 29-3. Additionally, Pettit also allegedly teased plaintiff when Pettit discovered plaintiff eating pepperoni pizza in the break room. *Id.*[5] According to plaintiff, he reported these comments to his shift manager, Lee Limbaugh. Decl. of Joy Ellis 17, ECF No. 29-1. Pettit transferred to a different department in February 2010, and had no further contact with plaintiff. Decl. of Joy Ellis 17, ECF No. 29-1; Decl. of Chaim Hertz 2, ECF No. 31.

---

[2] A yarmulke is "[a] skullcap worn by Jewish men and boys, especially those adhering to Orthodox or Conservative Judaism." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1992 (4th ed. 2000).

[3] Tzitzit are "the fringes or tassels worn on traditional or ceremonial garments by Jewish males as reminders of the commandments of Deuteronomy 22:12 and Num 15:37–41." MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/tzitzit (last visited June 23, 2014).

[4] "PeaceHealth is a not-for-profit health care system with medical centers, critical access hospitals, medicinal group clinics and laboratories located in Alaska, Washington and Oregon." PeaceHealth, *For the Media: Overview*, *available at* https://www.peacehealth.org/about-peacehealth/media/Pages/Default.aspx (last visited June 23, 2014).

[5] Plaintiff described this interaction as follows:

> I had gone to the break room to get a piece of pizza and all that was left was a pepperoni. I took a piece and Chris Pettit asked me if I knew that the pepperoni had pork in it. I told him yes, I'm not supposed to eat it but I'm really hungry. He said "I thought you Jews had to dance around, sing and pray to your fake [God] when you did something like that."

Decl. of Joy Ellis 3, ECF No. 29-3.

On another undated occasion in 2009, an unspecified employee allegedly told plaintiff that he wore a kippah to cover up his bald spot. Decl. of Joy Ellis 16, ECF No. 29-1. Plaintiff provided no evidence that he reported this comment.

In January 2010, plaintiff attended a mandatory CE meeting. Decl. of Joy Ellis 24, ECF No. 29-1. That multi-part meeting, lasting a few hours, consisted of multiple speakers. Decl. of Aaron W. Baker 2, 10, ECF No. 37-2 (indicating that defendant's chief executive officer Ran Whitehead also presented). During the final part, the last speaker, Rick Lyons, discussed defendant's mission statement. *Id.* at 3. To facilitate discussion, each employee was handed a hard copy of the mission statement with designated words underlined for discussion. *Id.* at 13. That handout provided, in relevant part:

PeaceHealth Mission Statement

> We carry on the healing mission of Jesus Christ by promoting personal and community health, relieving pain and suffering, AND treating each person in a loving and caring way.

Decl. of Aaron W. Baker 2, ECF No. 37-3.[6] The participating employees split into four or five groups. Decl. of Aaron W. Baker 6, ECF No. 37-2. In each group, the employees were asked to separately discuss what each underlined term meant to each employee. *Id.* at 14. Each group recorded its thoughts on a poster board to facilitate discussion among the groups. Decl. of Joy Ellis 3, ECF No. 29-3. After discussing the terms "we," "carry on," and "healing," Lyons directed the employees to write what "Jesus meant to [them]." *Id.*; Decl. of Aaron W. Baker 9, ECF No. 37-2. Plaintiff, after discussing the matter with his group members, decided not to

---

[6] This handout also depicted a compass in the upper left corner and Jesus in the upper right corner.

3 – OPINION AND ORDER

participate in defining "Jesus." *See* Decl. of Aaron W. Baker 6, ECF No. 37-2.[7] One of the other employee-participants in a different group, sitting behind plaintiff, wrote that Jesus was "the ONLY son of God" and plaintiff became uncomfortable. Decl. of Joy Ellis 3, ECF No. 29-3; *see also* Decl. of Aaron W. Baker 6–7, ECF No. 37-2. Lyons then followed up and expanded on the employee's comment. Decl. of Aaron W. Baker 7, ECF No. 37-2.

Sometime afterward, Lyons allegedly instructed the employees to "move closer in, and [Lyons] put the [poster] boards up where he had written [the employee's comment] down. And [Lyons] said, 'everybody get up and form a circle around me, and we are going to talk about Jesus.'" Decl. of Aaron W. Baker 7–8, ECF No. 37-2. Plaintiff initially "sat in the back by [himself]" while the other participants formed a circle around Lyons. *Id.* at 7, 10–11. At some point, Lyons allegedly looked at plaintiff and stated that Christianity is "a good religion." *Id.* at 8; Decl. of Aaron W. Baker 3, ECF No. 37-3. Plaintiff informed Lyons that it was not his religion and that plaintiff thought the discussion was "putting a wedge in our teamwork and the words we and together by excluding [plaintiff]." Decl. of Aaron W. Baker 3, ECF No. 37-3. Plaintiff left the room. *Id.* at 4.

Plaintiff returned to the meeting to see if the group had finished discussing "Jesus." *Id.* After finding that the group continued to talk about "Jesus and compassion," plaintiff made the following remark: "If you really want to talk about everything, what this means to you . . . . To me it means the Holocaust, the Black Plague," and the "way the Pope treated the Jews during World War [II]." Decl. of Aaron W. Baker 8, ECF No. 37-2; Decl. of Aaron W. Baker 5, ECF No. 37-3. Lyons allegedly then told plaintiff that plaintiff "[had] a tortured soul." Decl. of Aaron

---

[7] "So, I kind of looked at the people I was working with, and I said, 'Why don't I bow out of this one and let you guys do that?' And they did. And they . . . were very respectful. They didn't – it was nothing that would bother me." Decl. of Aaron W. Baker 6, ECF No. 37-2.

W. Baker 8, ECF No. 37-2; Decl. of Aaron W. Baker 5, ECF No. 37-3. Plaintiff responded: "I answer to a higher power." Decl. of Aaron W. Baker 8, ECF No. 37-2; *but see* Decl. of Aaron W. Baker 4, ECF No. 37-3 (indicating that plaintiff made this comment prior to plaintiff's initial departure). Lyons then allegedly made an unheard comment, resulting in a number of employee's laughing. Decl. of Aaron W. Baker 8, ECF No. 37-2; *but see* Decl. of Aaron W. Baker 4, ECF No. 37-3 (indicating that Lyons made this joke during plaintiff's initial departure). Plaintiff then "stormed out the door" to have a cigarette. Decl. of Aaron W. Baker 8, ECF No. 37-2.

After the CE meeting, plaintiff verbally complained to human resources. *Id*. at 15. His complaint resulted in a discussion of the incident with the following PeaceHealth administrators: Gloria Foust, Director; Sister Kathleen Pruitt, Vice President of Mission Integration and Spirituality; Hertz, Human Resources Director; and Stokes, Evening Supervisor. *Id*. at 16–18. Plaintiff alleges that during a meeting with Hertz and Stokes, Hertz continued to ask plaintiff whether he had a problem with the mission statement. *Id*. at 19. Hertz then allegedly stated: "Well, being's you have a problem with the mission statement . . . I just want to explain to you that I'm Atheist and Jacob's Atheist." *Id*. Stokes then allegedly suggested that plaintiff needed "to embrace the religion of the hospital that [plaintiff] work[ed] for." *Id*. After some additional conversation, Hertz allegedly said: "I don't know, you know, about keeping you after this incident." *Id*. at 20.

Sometime after that earlier meeting, plaintiff again met with Hertz and Stokes. *Id*. at 21. Hertz allegedly stated: "We talked to other people about what had happened in CE days, and we feel you were treated disrespectfully . . . . Do you want a letter in writing for apology?" *Id*. Plaintiff declined the letter and indicated that "this is resolved, I don't need it in writing." *Id*.

5 – OPINION AND ORDER

Hertz then informed plaintiff: "Well, whatever days you need off, whatever kind of accommodations you need, go ahead and write an e-mail." *Id*.

In April 2010, plaintiff alleges that a coworker, Luke O'Reilly, from the specimen processing department, told plaintiff that "it was ridiculous for PeaceHealth to hire a Jew to work there." Decl. of Joy Ellis 3, ECF No. 29-3; Decl. of Aaron W. Baker 44, ECF No. 37-1. Plaintiff did not report these comments. Decl. of Joy Ellis 3, ECF No. 29-3.

In June 2010, plaintiff alleges that Stokes yelled at him from across the room to take a break because it was required under Oregon law. Decl. of Aaron W. Baker 64–65, ECF No. 37-1; Decl. of Joy Ellis 23, ECF No. 29-1. After plaintiff failed to move as quickly as Stokes desired, Stokes "came around . . . [and] chased [plaintiff] towards the break room" and yelled "at [plaintiff] to go on break." Decl. of Aaron W. Baker 7, 64–65, ECF No. 37-1.[8]

In September 2010, plaintiff alleges that a coworker, Carlos, from the microbiology department, asked plaintiff why he worked at PeaceHealth when "Jews had money stashed and didn't really need to work." Decl. of Joy Ellis 3, ECF No. 29-3. Plaintiff did not report these comments. *Id*.

In November 2010,[9] plaintiff alleges a manager, Jeanne Nordloff, from a different department, asked plaintiff why he was taking Thanksgiving as a holiday; she suggested that Thanksgiving was a Christian holiday. *Id*. at 4. Plaintiff "discussed the matter with [Nordloff]

---

[8] Plaintiff further described the interaction as follows:

> He slammed - - he was stomping and slamming and running after me, and I stopped and turned around, and that's when he got in my face and started yelling at me, I mean, just loud, loud. My ears were ringing.

Decl. of Aaron W. Baker 65, ECF No. 37-1.

[9] The record is unclear whether this conversation took place in 2009 or 2010. *Compare* Decl. of Joy Ellis 4, ECF No. 29-3 (indicating that the conversation took place in 2010), *with* Decl. of Joy Ellis 13, ECF No. 29-1 (indicating that the conversation took place in 2009).

and [Nordloff] realized [plaintiff] was insulted." *Id*. Plaintiff did not report these comments. Decl. of Aaron W. Baker 47, ECF No. 37-1.

In December 2010, plaintiff alleges a coworker, Dan Markham, from plaintiff's department, informed plaintiff that plaintiff's people "are murderers and are the reason that there is conflict in the Middle East and America." *Id*.; *see also* Decl. of Aaron W. Baker 52, ECF No. 37-1 ("And one of the comments he made was, you know, 'You think you're all innocent,' or something, 'but I know that Jews are murderers, like everybody else.'"). At one point, this discussion escalated, and plaintiff yelled at Markham. Decl. of Aaron W. Baker 52, ECF No. 37-1. Plaintiff did not report these comments. Decl. of Joy Ellis 4, ECF No. 29-3.

Also, sometime in December 2010, plaintiff overheard two coworkers, O'Reilly and Matt Kueker, having a conversation in the break room. *Id*. O'Reilly allegedly told Kueker that "[t]hey should just send all the Jews back to Germany being it was Germany's fault that the Jews moved to Israel in the first place." *Id*.; Decl. of Aaron W. Baker 43, ECF No. 37-1. Plaintiff did not report these comments. Decl. of Joy Ellis 4, ECF No. 29-3; Decl. of Aaron W. Baker 44, ECF No. 37-1.

On May 26, 2011, Stokes sent plaintiff an email, which stated:

> I've had a few complaints about you leaving without checking in with night shift. Make sure you check in with them before you leave and please stay in your department until they release you.

Decl. of Joy Ellis 4, ECF No. 29-10. Plaintiff, in response, sent a series of emails to Stokes, Hertz, and the other evening shift leads (Nicky Kuecker, Tressa Hutt, Steve Yanit, and Kathy Oltion) contesting the allegations listed in Stokes's email. *Id*. at 2–4.[10]

---

[10] Plaintiff's email, dated May 28, 2011, provided:

On June 2, 2011, Stokes told plaintiff that "I need to talk to you," and asked plaintiff to follow him into his office. Decl. of Joy Ellis 34, ECF No. 29-1. After arriving in Stokes's office, Stokes allegedly pulled out the email correspondence and slammed it in front of plaintiff. *Id*. Stokes then told plaintiff: "You don't understand. When I get a complaint, I have to investigate it. This is part of my investigation." *Id*. Plaintiff allegedly responded: "Well, those e-mails should help you with your investigation." *Id*. at 35. Stokes "didn't look at it that way. [Stokes] felt that [Plaintiff] was interfering with the job that he had to do." *Id*. Stokes then asked plaintiff to sign an employee corrective action form for "Absenteeism/Tardiness." *Id*.; Decl. of Joy Ellis 1–2, ECF No. 29-9 (Corrective Action Form).[11] Plaintiff refused to sign the paperwork. Decl. of Joy Ellis 35, ECF No. 29-1. Stokes then allegedly shoved the paperwork in front of plaintiff,

---

Not only do I check like everyone else does, I am the only one that doesn't leave early. Even when others leave early I stay at least 15 minutes later. I think this warrants further investigation and I would like to specifically discuss this with all the people that are accusing me of this. I am not the lead usually, so I would also like in writing from the leads that I am leaving without permission. So a copy of this is being sent to the leads as well.

*Id*. Plaintiff's subsequent email, dated May 30, 2011, provided:

Let me clarify. I don't mean that I'm the only one that doesn't leave early, I mean that I ONLY leave with the expressed permission of the night shift techs I am working with and the eve lead I go out of my way to track down the night shift tech who is taking over to go over the pending and offer my help to ALL the benches, not just the one I'm working on, as well as a verbal cross over I almost always stay until I am not doing anything for a good 15 minutes before I leave and sometimes late if there are a TDX issue, I guess I was expecting a "good Job" compliment not a complaint. If Jacob would of asked me I would of told him this complaint is outrageous, but being[] my guilt was assumed and a paper trial was started I have to follow up in writing. For any employee to work so hard to do a good job and then accused of doing the opposite is just down right depressing. I have always been open for discussion with anybody that has issues with me, but complaining behind my back without even talking to me about it is just unprofessional and non-productive. I expect to get in trouble for letting the leads and HR in on this, but it seems every year when reviews come up this happens with me and the "secret complainer" gets their way and I have no defense until it's [too] late and if there is a complaint it should show a pattern of an employee and not just one person's perception without question. That's why I took the initiative to get all the leads opinions [] I apologize in advance if this puts anyone in an awkward position, but a response is not required.

*Id*. at 3.

[11] The Corrective Action Form, dated May 26, 2011, identified five dates of Absenteeism/Tardiness: December 17, 2010; February 10, 2011; May 12, 2011; May 15, 2011; and May 16, 2011. Decl. of Joy Ellis 1, ECF No. 29-9.

8 – OPINION AND ORDER

again instructing plaintiff to sign. *Id*. Plaintiff refused and told Stokes that he didn't "want to talk about this now." *Id*. Stokes allegedly got red, pushed back his chair and stood over plaintiff. *Id*. Plaintiff then allegedly told Stokes: "[l]ets talk about this tomorrow. I'll be writing a letter for tomorrow morning." *Id*. Plaintiff got up and left Stokes's office. *Id*. at 36. Stokes then allegedly followed plaintiff out of the office and called him back, telling plaintiff: "Give me your badge right now. You're fired right now." *Id*. at 36, 40. Plaintiff turned over his badge and departed. *Id*. at 36. "Defendant contends that Plaintiff unequivocally resigned during this meeting and handed his badge to Stokes as a final dramatic gesture." Def.'s Mem. in Supp. of Mot. Summ. J. 10, ECF No. 28; *see also* Decl. of Julie Halic 1, ECF No. 30-1 (indicating that plaintiff resigned).

On or about June 3, 2011, plaintiff contacted Hertz by telephone and was informed that he would be placed on administrative leave. Decl. of Aaron W. Baker 56, ECF No. 37-2. Hertz also "instructed [plaintiff] to write a letter about what happened." *Id*. at 57.

On or about June 6, 2011, plaintiff wrote a letter to Hertz briefly explaining his version of events occurring June 2, 2011. *Id*.; Decl. of Joy Ellis 1–3, ECF No. 29-11. Plaintiff's letter also requested reinstatement without ramification. Decl. of Joy Ellis 3, ECF No. 29-11.

On June 10, 2011, plaintiff met with Hertz and Julie Halic, defendant's Chief Operating Officer, to discuss the incident occurring June 2, 2011. Decl. of Julie Halic 1, ECF No. 30. Plaintiff discussed his version of the incident and was asked whether he could continue to work with Stokes. Decl. of Aaron W. Baker 59–60, ECF No. 37-2. Plaintiff informed Hertz and Halic that he could continue to work under Stokes, but that he wanted Stokes to "lay off and quit riding [him]." *Id*. at 60; Decl. of Julie Halic 1, ECF No. 30-1.

On or about June 14, 2011, Halic sent plaintiff a letter informing him that he would not be reinstated. *Id*. Halic, in reliance upon consultation with Hertz and Teresa Johnson, Director of

9 – OPINION AND ORDER

Operations, and the June 10 meeting with plaintiff, declined to recommend reinstatement. Decl. of Julie Halic 2, ECF No. 30. Halic's decision was "based upon [the June 10, 2011] meeting . . . and was based upon [Plaintiff's] behavior in his meeting with Mr. Stokes and [plaintiff's] challenges accepting direction and coaching from his supervisor." *Id.*; *see also* Decl. of Julie Halic 1, ECF No. 30-1 ("[Plaintiff] shared that if [he] had the opportunity to return, [he] would not want [his] supervisor to supervise [him]"); Decl. of Aaron W. Baker 60, ECF No. 37-2 ("I want [Stokes] to lay off and quit riding me all the time.").

## STANDARD OF REVIEW

This Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

## DISCUSSION

Plaintiff, in his complaint, contends that: (1) defendant discriminated against him in the terms and conditions of his employment in violation of Title VII and (2) defendant subjected him

to a hostile work environment in violation of Title VII. Defendant moves for summary judgment as to both claims.

## I. Disparate Treatment, Title VII

Plaintiff alleges that he was discriminated against in the terms and conditions of his employment in violation of Title VII. Pl.'s Second Am. Compl. 3, ECF No. 8. In responding to defendant's motion for summary judgment, plaintiff "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the defendant. *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)) (internal quotation marks omitted). "Direct evidence is evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption. Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citations and internal quotation marks omitted); *cf. Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (defining direct evidence under the ADEA as "evidence of conduct of statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the *fact finder* to infer that the attitude was more likely than not a motivating factor in the employer's decision.") (citation and internal quotation marks omitted)). Plaintiff has not provided direct evidence of discriminatory intent. [12] *See* Decl. of Joy Ellis 18, ECF No. 29-1 ("Q. But you can't think of any supervisor who ever uttered a religious slur in your presence, can

---

[12] Plaintiff, in his response, states: "Mills has provided direct evidence of discrimination including being subject to heightened discipline and comments by management regarding religion and the workplace." Pl.'s Resp. to Def.'s Mot. Summ. J. 7, ECF No. 36. Plaintiff's conclusory statement, particularly when unsupported by specific allegations in the record, does not constitute direct evidence of discriminatory intent.

you? A. Right now, no."); Decl. of Aaron W. Baker 57, ECF No. 37-1 ("I don't recall a supervisor talking about my garments, right now."). However, to the extent that plaintiff offers circumstantial evidence, this Court will utilize the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, plaintiff must demonstrate that "(1) [he] belongs to a protected class, (2) [he] was performing according to [his] employer's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) other employees with qualifications similar to [his] own were treated more favorably." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citations omitted). "If the plaintiff succeeds in [establishing his prima facie case], then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003). Because the parties do not dispute the first prong of plaintiff's prima facie burden, this Court's analysis will focus on the final three prongs.

Plaintiff alleges multiple incidents of disparate treatment, including: (1) in January 2010, Lyons told plaintiff "Christianity is a good religion" and plaintiff had "a tortured soul" during the CE meeting; (2) in June 2010, Stokes yelled and got in plaintiff's face, demanding that plaintiff take his break; (3) Stokes discriminatorily enforced defendant's attendance policy; (4) Stokes failed to reasonably accommodate and/or discriminatorily accommodated plaintiff's religious observance; (5) Stokes left plaintiff out of notices of appreciation during meetings; (6) Stokes

discriminatorily assigned positions and excluded plaintiff from "lead" only lab meetings; and (7) defendant terminated plaintiff. Pl.'s Resp. to Def.'s Mot. Summ. J. 2–3, 8, ECF No. 36.[13]

First, as to plaintiff's January and June 2010 allegations, defendant contends that both fall outside of the filing period. Def.'s Mem. in Supp. of Mot. Summ. J. 9, ECF No. 28 (indicating that "November 20, 2010, is the cut-off date for Plaintiff's Title VII claims"); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) ("We hold that [Title VII] precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period."); 42 U.S.C. § 2000e-5(e)(1). Plaintiff articulates no argument in response. Both of these allegations, like a denial of training or false accusation, represent discrete acts of possible discrimination. "Because [plaintiff] first filed his charge with an appropriate . . . agency, only those acts that occurred 300 days before [September 15, 2011], the day that [plaintiff] filed his charge, are actionable." *Morgan*, 536 U.S. at 114; *see also* Decl. of Joy Ellis 1, 29-7 (Equal Employment Opportunity Commission document). Thus, plaintiff's allegations occurring in January 2010 and June 2010 "are untimely filed and no longer actionable." *Morgan*, 536 U.S at 115.

Second, plaintiff alleges that defendant discriminatorily applied its attendance policy and subjected plaintiff to "different rules." These rules "included how many minutes Mills could be late, [and] when and how he could leave early." Pl.'s Resp. to Def.'s Mot. Summ. J. 3, ECF No. 36. At the time of plaintiff's employment, defendant used a computer program, Lab Tools, to record each employee's arrival time. Decl. of Chaim Hertz 3, ECF No. 44. Plaintiff alleges that

---

[13] This Court notes that the allegations listed are derived from plaintiff's "Statement of Supplemental Facts," not plaintiff's substantive response to summary judgment. In plaintiff's substantive response, plaintiff merely asserted: "he was performing the job in a satisfactory manner and much of his discipline was fabricated" and that Stokes "yell[ed] and belittle[ed] [plaintiff]." Pl.'s Resp. to Def.'s Mot. Summ. J. 8, ECF No. 36.

his coworkers, including Tressa Hutt, Chris Pettit,[14] and Kathy Oltion, were late regularly and not reprimanded. Decl. of Aaron W. Baker 11, ECF No. 37-1. These allegations do not rise to the level of adverse employment action. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2000) ("[A]n adverse employment action is one that materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." (citations and internal quotation marks omitted)). Plaintiff was merely required to arrive at work at his scheduled time. Even assuming that these allegations met plaintiff's prima facie burden as to Hutt and Oltion, defendant articulates a legitimate, nondiscriminatory reason: neutral enforcement of a standard attendance policy. *See, e.g.*, Decl. of Chaim Hertz 2–4, ECF No. 44. In support of defendant's legitimate, nondiscriminatory reason, defendant provides documentation and declarations demonstrating that the two coworkers identified were not late regularly, *see, e.g.*, Second Decl. of Joy Ellis 2, ECF No. 42-1 ("And do you know if anyone who was late or absent received coaching or verbal warnings . . . . I wouldn't have that information."); Decl. of Chaim Hertz 3, ECF No. 44 (identifying each relevant employees' absentee rate), and that plaintiff had documented attendance issues, *see, e.g.*, Decl. of Joy Ellis 1–2, ECF No. 29-4 (identifying plaintiff's absentee rate as 5.2% in July 2010).[15] Plaintiff articulates no argument that defendant's reason is pretextual. Thus, defendant is granted summary judgment as to plaintiff's attendance policy allegations. *See also Schuler v. Chronicle Broad. Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986) ("[P]laintiff must . . . offer specific and significantly probative evidence that the employer's alleged purpose is a pretext for discrimination.").

---

[14] Pettit transferred out of plaintiff's department in February 2010; any allegations involving Pettit occurred outside of the filing period. Decl. of Joy Ellis 17, ECF No. 29-1.

[15] Plaintiff's 2006, 2008, and 2009 Performance Appraisals identified plaintiff's "[f]requent tardiness" and "[r]epeated absences." *See* Decl. of Joy Ellis 6, 12, 18, ECF No. 29-2; *see also* Decl. of Joy Ellis 3, ECF No. 29-1 ("Q. How was your attendance when you worked at PeaceHealth Labs? A. It was poor.").

Third, plaintiff alleges that Stokes failed to reasonably accommodate and/or discriminatorily accommodated plaintiff's religious observance or practice. Defendant contends that plaintiff is barred from asserting these allegations because they were not raised in plaintiff's EEOC charge. Def.'s Mem. in Supp. of Mot. Summ. J.27, ECF No. 28; *see also Green v. L.A. Cnty. Superintendent of Sch.*, 883 F.2d 1472, 1476 (9th Cir. 1989) ("Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegation contained in the EEOC charge." (citations and internal quotation marks omitted)). Plaintiff articulates no argument in response.

"In determining whether an allegation under Title VII is like or reasonably related to allegations contained in a previous EEOC charge, the court inquires whether the original EEOC investigation would have encompassed the additional charges." *Green*, 883 F.2d at 1476 (citation omitted). Plaintiff's charging instrument to the Oregon Bureau of Labor & Industries and the EEOC alleged that he was subjected to harassment and terminated because of his religion. *See* Decl. of Joy Ellis 1, ECF No. 29-12. Plaintiff also submitted an intake questionnaire, Decl. of Joy Ellis 1, ECF No. 29-7, and a charge letter to the EEOC, Decl. of Aaron W. Baker 10–18, ECF No. 37-3. Plaintiff's charge letter to the EEOC included explicit references to religious accommodation. *See, e.g.*, Decl. of Aaron W. Baker 10, 14–15, ECF No. 37-3. Upon consideration of this documentation, this Court finds that these allegations are encompassed within the original EEOC investigation. Thus, this Court considers plaintiff's failure to accommodate and discriminatory accommodation allegations.

As to religious accommodation, Title VII "imposes a duty of reasonable accommodation on employers." *Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir. 1996). "[T]his court applies a two-part framework to review claims of religious discrimination."

15 – OPINION AND ORDER

*City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc) (citations omitted). "First, the employee has the burden to establish a prima facie case of religious discrimination." *Id*. (citation omitted). "A prima facie case of discrimination is proven if (1) the employee has a bona fide religious belief, the practice of which conflicted with an employment duty; (2) the employee informs the employer of the belief and conflict; and (3) the employer threatens or subjects the employee to discriminatory treatment because of the employee's inability to fulfill the job requirements." *Id*. at 1050 n. 3. "Second, if the employee has proven his or her prima facie case, then the employer has the burden to show either that it attempted to reasonably accommodate the employee's religious beliefs or that any accommodation of the employee's needs would result in undue hardship." *Id*. at 1050–51.

Plaintiff does not articulate an argument or attempt to meet his prima facie burden. Even assuming that these allegations met plaintiff's prima facie burden (which this Court does not decide), defendant argues that it reasonably accommodated plaintiff's religious needs. Pursuant to defendant's attendance policy, if an employee was scheduled for fewer than 32 hours during a week, that employee would use PTO to meet the deficiency. Decl. of Joy Ellis 31, ECF No. 29-1. Between November 20, 2010, and plaintiff's last day of employment, June 2, 2011, plaintiff was not scheduled to work on those days he expressly requested off for religious accommodation and/or he was otherwise able to find coverage among his coworkers *See id*. at 30–31; Decl. of Joy Ellis 1–6, ECF No. 29-8. To the extent that plaintiff was required to use PTO to accommodate his religious needs, defendant's policy does not constitute a failure to accommodate. *See Ansonia v. Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70–71 (1986) (finding that unpaid leave is a reasonable accommodation unless used to target religious absences).

Plaintiff also alleges that defendant discriminatorily accommodated religious observance or practice. Plaintiff stated that "[a] Christian was allowed to consistently take her Sabbath off when [plaintiff] was not." Pl.'s Resp. to Def.'s Mot. Summ. J. 3, ECF No. 36; *see also* Decl. of Joy Ellis 15, ECF No. 29-1; Decl. of Aaron W. Baker 41, ECF No. 37-2. In deposition testimony, plaintiff indicated that this coworker, Rae Sutton, informed him that she contractually received an accommodation for her Saturday Sabbath. Decl. of Aaron W. Baker 41, ECF No. 37-2. Because these allegations meet plaintiff's *McDonnell Douglas* burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *Vasquez*, 349 F.3d at 640.

To meet its burden, defendant proffers that Ms. Sutton and another day shift employee voluntarily agreed upon a standing shift trade. Decl. of Chaim Hertz 1, ECF No. 44. Defendant was "not involved in setting this work schedule," but merely allowed this standing trade pursuant to the neutral policy also applicable to plaintiff. *Id*. at 1–2; *see also* Decl. of Joy Ellis 31, ECF No. 29-1 (indicating that plaintiff successfully traded shifts to accommodate his religious practices). Defendant's explanation constitutes a legitimate, nondiscriminatory reason. Plaintiff articulates no argument that defendant's reason is pretextual. Thus, defendant is granted summary judgment as to plaintiff's discriminatory accommodation allegation. *See Schuler*, 793 F.2d at 1011 ("[T]he employee must do more than establish a prima facie case . . . ." (citation omitted)).

Fourth, plaintiff alleges that Stokes excluded him from "mention for doing a good job," and that he had to speak up in order to receive recognition during meetings, i.e., "What about me?" Decl. of Aaron W. Baker 62, ECF No. 37-2. Plaintiff indicated that he received a "prize" for doing a good job and that his coworkers knew that he "also got recognized." *Id*. Any alleged

difference in treatment does not rise to the level of adverse employment action. *See, e.g.*, *Davis*, 520 F.3d at 1089.

Fifth, plaintiff alleges that Stokes discriminatorily assigned positions, e.g., "lead" positions, and subsequently excluded him from "lead" only lab meetings. *See* Decl. of Aaron W. Baker 66, ECF No. 37-1. Assuming that this allegation meets the first three prongs of plaintiff's burden, plaintiff still needs to demonstrate that "other employees with qualifications similar to [his] own were treated more favorably." *Vasquez*, 349 F.3d at 640. "Individuals are similarly situated when they have similar jobs and display similar conduct." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (citation and internal quotation marks omitted). Plaintiff provides no argument or evidence under this fourth prong. Thus, plaintiff did not meet his prima facie burden as to this allegation.

Sixth, plaintiff alleges that defendant terminated his employment on the basis of his religion. Pl.'s Second Am. Compl. 3, ECF No. 8. Plaintiff argues that he was "essentially fired twice." Pl.'s Resp. to Def.'s Mot. Summ. J. 9, ECF No. 36. First by Stokes on June 2, 2011, and second, on or about June 14, 2011, by Halic when she informed him that he would not be reinstated. Because plaintiff's employment ended on or about June 14, 2011,[16] this Court's inquiry will focus on that termination decision.

The parties contest whether plaintiff resigned or was terminated. *See, e.g.*, Def.'s Mem. in Supp. of Mot. Summ. J. 10 n. 2, ECF No. 28. However, for purposes of this analysis, neither party disputes that termination constitutes an adverse employment action. Assuming that

---

[16] Plaintiff was placed on administrative leave from June 3, 2011 until approximately June 14, 2011. Decl. of Aaron W. Baker 56, ECF No. 37-2.

18 – OPINION AND ORDER

plaintiff's termination meets the remaining prongs (which this Court does not decide), the burden shifts to the defendant.

> To meet its burden, defendant argues that:
>
>> The legitimate nondiscriminatory reason not to re-instate Plaintiff is supported by the following evidence: (1) his "improvement required" 2010 performance appraisal; (2) his conduct in the June 2, 2011, meeting with Stokes; (3) Johnson's concern, shared with Halic, regarding Plaintiff's previous conduct with past supervisors; and (4) the statements Plaintiff made to Halic in their meeting after his separation of employment.

*Id*. at 25; *see also* Decl. of Julie Halic 1, ECF No. 30 ("[Plaintiff] told me he had resigned in anger during his meeting with his supervisor, Jacob Stokes."). Defendant's explanation constitutes a legitimate, nondiscriminatory reason. Plaintiff articulates no argument that defendant's reason is pretextual. This Court, having reviewed the deposition testimony, notes that plaintiff disputes Halic's characterization of statements made by plaintiff during the June 10, 2011 HR meeting. *See, e.g.*, Decl. of Aaron W. Baker 60, ECF No. 37-2.[17] However, plaintiff "cannot defeat summary judgment with . . . unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, defendant is granted summary judgment as to plaintiff's termination allegation.

## II. Hostile Work Environment, Title VII

Title VII establishes a two-part test for determining employer liability in the context of a hostile work environment claim. *See, e.g.*, *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864,

---

[17] Plaintiff, during his deposition, stated:

> And then I got a letter saying that by me saying that I wanted Chaim – Not Chaim - - Jacob to lay off me, that that was saying that I refused to let my supervisor supervise me. And I said - - she mentioned that during the meeting, and I said, "No, I'm not saying that I don't want him to supervise me. I'm saying that I want him to lay off and quit riding me all the time."

Decl. of Aaron W. Baker 60, ECF No. 37-2.

19 – OPINION AND ORDER

875 (9th Cir. 2001); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462–63 (9th Cir. 1994). First, a plaintiff must establish a prima facie hostile work environment claim. Second, if a plaintiff is successful in establishing his or her prima facie claim, then this Court must assess whether the employer is liable either vicariously or through negligence.[18]

## A. Prima Facie Hostile Work Environment Claim

To prevail on a hostile work environment claim, a plaintiff must show: "(1) that he was subjected to verbal or physical conduct of a [religious] nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642 (citing *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)); *see also Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (identifying plaintiff's prima facie burden for a hostile work environment based on religious discrimination). Plaintiff "must present sufficient evidence for a jury question on whether the work environment was 'both objectively and subjectively offensive, one that a reasonable person would find hostile and one that the victim in fact did perceive to be so.'" *E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 997 (9th Cir. 2010). Because the parties do not contest that plaintiff met his burden under the first two prongs, this Court's inquiry will focus on the third prong. *See, e.g.*, Def.'s Mem. in Supp. of Mot. Summ. J. 17, ECF No. 28.

In determining whether conduct rises to the level of severe and pervasive, this Court focuses on the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[18] *See, e.g.*, *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2454 (2013) (defining "supervisor" for purposes of vicarious liability); *Nichols*, 256 F.3d at 875 (noting that "[w]hen harassment by co-workers is at issue, the employer's conduct is reviewed for negligence").

with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). Defendant contends that plaintiff's allegations, collectively, do not meet this severe and pervasive threshold. Def.'s Mem. in Supp. of Mot. Summ. J. 17–20, ECF No. 28.

As an initial matter, this Court must decide the temporal scope of considered conduct. In *Morgan*, the Supreme Court indicated that "[h]ostile environment claims are different in kind from discrete actions." 536 U.S. at 115. "Their very nature involves repeated conduct." *Id*. The Supreme Court further elaborated:

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.
>
> . . .
>
> In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*Id*. at 117–18. As indicated above (§ I), November 10, 2010 represents the beginning of plaintiff's 300-day filing period. In addition to the allegations of disparate treatment identified above (§ I), plaintiff also alleges that two incidents involving coworkers and at least two incidents involving management occurred during this filing period. Those incidents include:

> **November 2010**: Manager Nordloff, from a different department, suggested that Thanksgiving was a Christian Holiday.
>
> **December 2010**: Coworker Markham told plaintiff that "Jews are murderers, like everyone else." This conversation escalated and plaintiff yelled at Markham.
>
> **December 2010**: Coworkers O'Reilly and Matt Kueker discussed Israel and O'Reilly told Kueker that "[t]hey should just send all the Jews back to Germany being it was Germany's fault that the Jews moved to Israel in the first place."

21 – OPINION AND ORDER

> **June 2011**: Supervisor Stokes slammed his first against his desk twice and attempted to intimidate plaintiff. Stokes subsequently terminated plaintiff.

Of plaintiff's alleged conduct occurring outside of this filing period, this Court is reluctant to find that this conduct has "no relation to the acts" falling within the filing period. *Morgan*, 536 U.S. at 118. In contrast, much of this conduct involves the same actors and/or similar conduct.[19] Thus, this Court also considers the following alleged incidents:

> **January 2010**: Plaintiff attended a CE event in which speaker Rick Lyons stated Christianity is "a good religion" and told plaintiff he had a "tortured soul." Plaintiff subsequently met with HR, including Hertz and Stokes. During a subsequent meeting, Stokes, an atheist, suggested that plaintiff "embrace Catholicism."

> **April 2010**: Coworker O'Reilly told plaintiff "it was ridiculous for [defendant] to hire a Jew to work there."

> **June 2010**: Supervisor Stokes yelled at plaintiff to take his break from across the room. After plaintiff failed to immediately comply, Stokes "chased [plaintiff] towards the break room" and yelled in plaintiff's face.

> **September 2010**: Coworker Carlos, from a different department, asked plaintiff why he worked at PeaceHealth when "Jews had money stashed and didn't really need to work."

In assessing all of the alleged conduct above, it is important to note that Title VII is not a code of "general civility." *Faragher*, 524 U.S. at 778. Nor does Title VII protect against "sporadic use of abusive language . . . jokes, and occasional teasing." *Prospect Airport Servs., Inc.*, 621 F.3d at 998; *see also Faragher*, 524 U.S. at 788 ("[S]imple teasing, offhand comments, and isolated incidents . . . will not amount to discriminatory changes in the terms and conditions of employment." (citation and internal quotation marks omitted)). "[C]onduct must be extreme to

---

[19] This Court declines to consider statements allegedly made by coworker Pettit. Pettit was transferred to a different department in February 2010 and had no further contact with plaintiff. Decl. of Chaim Hertz 3, ECF No. 44; *see also Morgan*, 536 U.S. at 118 ("[I]f an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts.").

amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. To meet the severe and pervasive factor, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (citations and internal quotation marks omitted). Although defendant contests plaintiff's subjective perception of abuse, this Court focuses on the objective inquiry because it is dispositive under these circumstances.

Plaintiff alleges two primary sources of discriminatory conduct/comments: (1) coworkers and (2) supervisor Stokes. Plaintiff alleges discriminatory coworker statements involving speakers from different departments often delivered in one-on-one situations. Of these comments, one comment appeared to result from a misunderstanding (November 2010) and another comment involved a political discussion of the Middle East not directed at plaintiff (December 2010). These coworker comments, while offensive and inappropriate, did not so pollute the workplace that it altered the conditions of plaintiff's employment. *See, e.g.*, *infra* note 24; *see also Faragher*, 524 U.S. at 788. However, this Court also must assess these comments in the context of the allegations involving Stokes. *Brooks*, 229 F.3d at 923–24 ("We use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment." (citation omitted)).

Plaintiff alleges that Stokes identified himself as an Atheist, but suggested that plaintiff embrace Catholicism. Decl. of Aaron W. Baker 1, 19, ECF No. 37-2. Plaintiff does not allege that Stokes made any additional religiously charged comments. *See* Decl. of Joy Ellis 18, ECF No. 29-1 ("Q. But you can't think of any supervisor who ever uttered a religious slur in your presence, can you? A. Right now, no."); Decl. of Aaron W. Baker 57, ECF No. 37-1 ("I don't recall a supervisor talking about my garments, right now."). Stokes allegedly made this

23 – OPINION AND ORDER

suggestion three times; once following the CE event and twice when plaintiff complained about "someone being – well, you know, it's – they're Catholic, or whatever." Decl. of Aaron W. Baker 1, ECF No. 37-2. In addition to these comments, plaintiff alleges the allegations of disparate treatment identified above (§ I), e.g., discriminatory attendance enforcement and discriminatory scheduling. Collectively, these allegations, even if combined with the alleged coworker conduct, still do not rise to the level of severe and pervasive outlined in the case law. *See also* Decl. of Aaron W. Baker 60, ECF No. 37-2 (indicating that plaintiff would work under Stokes if Stokes "la[id] off and quit riding [him] all the time.").

For example, in *Manatt v. Bank of Am., NA*, 339 F.3d 792, 795–96 (9th Cir. 2003), a bank employee of Chinese descent brought a racially hostile work environment claim alleging seven explicit racial comments/behaviors including: (1) plaintiff overheard a coworker say to a supervisor "I am not a China man, I'm not like China man with their eyes like that"; (2) a supervisor told plaintiff "I've had the word kind of trouble with your countrymen"; (3) plaintiff overheard coworkers saying "China man" and "rickshaw"; (4) plaintiff heard the phrase "China man" spoken in the context of jokes on several occasions; (5) plaintiff heard co-workers refer to Chinese as "those communists from Beijing"; (6) plaintiff was told by a coworker: "China woman, China woman, China woman, get your butt over here" and was then asked to repeatedly and improperly pronounce "Lima" for other coworkers; and (7) plaintiff saw coworkers on multiple occasions pull their eyes back with their fingers to imitate or mock the appearance of Asians. *Compare Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1037 (9th Cir. 1990) (affirming defendant's "directed verdict" on plaintiff's hostile work environment claim),[20] *with Draper v.*

---

[20] In *Sanchez*, the Ninth Circuit held that no reasonable jury could find a hostile work environment existed despite allegations that Sanchez's employer (1) posted a racially offensive cartoon; (2) made racially offensive slurs; (3) targeted Latinos when enforcing rules; (4) provided unsafe vehicles to Latinos; (5) did not provide adequate police

*Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998) (reversing district court's grant of summary judgment on plaintiff's hostile work environment claim),[21] *and Nichols*, 256 F.3d at 875 (reversing district court's bench trial ruling that plaintiff did not meet his prima facie hostile work environment burden).[22] Upon consideration of these allegations, the Ninth Circuit held that Manatt's allegations were not sufficiently severe and pervasive. *Manatt*, 339 F.3d at 799.

This Court is certainly troubled by plaintiff's allegations and recognizes that these events likely caused plaintiff to suffer pain. However, "[w]hen compared to other hostile work environment cases, the events in this case are not severe or pervasive enough to violate Title VII." *Vasquez*, 349 F.3d at 643. Plaintiff's allegations do not rise to the pervasiveness and severity outlined in *Manatt*.[23] Accordingly, plaintiff's hostile work environment claim must fail and defendant is granted summary judgment as to this claim.

**B. Employer Liability**

Although plaintiff did not meet his prima facie burden above, a brief assessment of defendant's potential liability remains informative. An employer may be held liable either vicariously, i.e., through the discriminatory conduct of a "supervisor," or through negligence,

---

backup to Latino officers; and (6) kept illegal personnel files on employees because they were Latino. 936 F.2d at 1031, 1036.

[21] In *Draper*, the Ninth Circuit found that defendant created a hostile work environment where plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period: (1) plaintiff's supervisor called her "beautiful" and "gorgeous" rather than by her name; (2) he told plaintiff about his sexual fantasies with her; (3) he commented on plaintiff's "ass" several times; (4) he asked over a loudspeaker if plaintiff needed help changing clothes; (5) he required plaintiff to eat lunch with him; and (6) he asked plaintiff, who was of Mexican origin, whether a Mexican prostitute was called a "frijole." 147 F.3d at 1105–106.

[22] In *Nichols*, plaintiff, who was male, alleged that his coworkers (1) repeatedly referred to him as "she" and "her," (2) mocked him "for walking and carrying his serving tray 'like a woman,'" and (3) taunted him in Spanish and English as a "faggot" and a "fu* *ing female whore." 256 F.3d at 870. Plaintiff alleged that these remarks occurred at least once a week and often several times a day between 1991 and 1995. *Id*.

[23] *See, e.g.*, Decl. of Joy Ellis 18, ECF No. 29-1 ("Q. But you can't think of any supervisor who ever uttered a religious slur in your presence, can you? A. Right now, no."); Decl. of Joy Ellis 1–2, ECF No. 29-11 ("The majority of my working relationships with my co-workers on evening shift and night shift are positive and professional. We like each other and often comment on the mutual respect we all have for each other."); Decl. of Aaron W. Baker 33, 57, ECF No. 37-1 ("Q. And how well did not evening shift get along with itself . . . . A. I got along with them very well.").

i.e., through the discriminatory conduct of a coworker. *See McGinest*, 360 F.3d at 1119 (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001)).

### i. Vicarious Liability

"In general, an employer is vicariously liable for a hostile work environment created by a supervisor." *Nichols*, 256 F.3d at 877 (citing *Faragher*, 524 U.S. at 780). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 133 S. Ct. at 2453. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "However, when no tangible employment action has been taken, an employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Nichols*, at 877 (citation and internal quotation marks omitted). This affirmative defense has two prongs: (1) that the employer exercised reasonable care to prevent and correct promptly any [religiously] harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (citation and internal quotation marks omitted); *see also Swinton*, 270 F.3d at 804 (noting that the "defendant must establish the corrective action as an affirmative defense").

Plaintiff's allegations relating to supervisor discrimination focus on Stokes. *See, e.g.*, Decl. of Aaron W. Baker 5, ECF No. 37-1 ("How was your working relationship with Lee Limbaugh? It was fantastic. He was one of the best supervisors I ever had . . . . he actually supported, he was very supportive of me."). As indicated above (§ I), most of Stokes's alleged

26 – OPINION AND ORDER

conduct likely does not constitute tangible employment action, i.e., a significant change in employment status. However, because plaintiff asserts he was *terminated*, there remains a genuine issue of material fact as to whether tangible employment action has been taken.

## ii. Negligence

An employer is liable "for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest*, 360 F.3d at 1119–20 (quoting *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991) (internal quotation marks omitted). The reasonableness of an employer's remedy depends on the remedy's "ability to: (1) stop harassment by the person who engaged in harassment; and (2) persuade potential harassers to refrain from unlawful conduct." *Nichols*, 256 F.3d at 875 (citation and internal quotation marks omitted). "When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment." *Id.* (citing *Fuller v. City of Oakland*, 47 F.3d 1522, 1528–29 (9th Cir. 1995)). Ultimately, "the plaintiff bears the burden of proving the employer's failure to respond adequately to the harassment." *Swinton*, 270 F.3d at 804.

Plaintiff alleges approximately seven incidents of discriminatory coworker conduct between 2009 and December 2010. Of these allegations, plaintiff only reported comments made by coworker Chris Pettit.[24] However, as indicated *supra* note 19, Pettit transferred to a different department in February 2010 and had no further contact with plaintiff. As to the remaining acts, plaintiff essentially argues that it would have been futile for him to report the additional conduct:

---

[24] To the extent that plaintiff reported comments made during the January 2010 CE meeting, that incident was resolved. Decl. of Aaron W. Baker 21, ECF No. 37-2.

"[plaintiff] felt like he couldn't complain to HR because they did not solve the problems (except maybe for one), he was retaliated against, and Stokes would get upset and it would affect his performance reviews." Pl.'s Resp. to Def.'s Mot. Summ. J. 4, ECF No. 36.

Plaintiff had four reporting avenues available to him, including: (1) his supervisor; (2) Human Resources; (3) off-site Human Resources in the PeaceHealth organization; and (4) an anonymous hotline. Decl. of Chaim Hertz 2, ECF No. 31. These reporting procedures were outlined and available on PeaceHealth intranet, accessible on each PeaceHealth computer terminal. Plaintiff had previously utilized the first three avenues to resolve the January 2010 CE incident. Decl. of Aaron W. Baker 21, ECF No. 37-2. Plaintiff's conclusory statement is insufficient to support his futility argument. Following plaintiff's interaction with Stokes on June 2, 2011, plaintiff contacted on-site Human Resources (Hertz), *id*. at 56, and off-site Human Resources (Pruitt), Decl. of Joy Ellis 1–2, 29-10. Accordingly, management-level employees neither knew nor should have known given the exercise of reasonable care about the alleged coworker comments.

## CONCLUSION

For these reasons, defendant's motion for summary judgment, ECF No. 27, is GRANTED.

IT IS SO ORDERED.

DATED this 14th day of July, 2014.


_____/s/ Michael J. McShane_____
**Michael J. McShane**
**United States District Judge**

28 – OPINION AND ORDER